Golden Rule v. Hartwell                    CV-94-332-M    07/17/95
                UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


Golden Rule Insurance Company,
      Plaintiff,

      v.                                      Civil No. 94-332-M

Wesley H. Hartwell, Individually and As
Executor and/or Administrator of the
Estate of Patricia Ann Hartwell,
      Defendant.


                          O R D E R


     Golden Rule Insurance Company filed this action under 28

U.S.C. §2201 seeking a declaration that it has no duty to

reimburse defendant, Wesley Hartwell, for medical expenses

incurred by his late wife, Patricia Hartwell.  Jurisdiction is

based upon diversity of citizenship and an amount in controversy

in excess of $50,000.00.  28 U.S.C. §1332(a).


     Mr. Hartwell moves for summary judgment, arguing that, as a

matter of law, Golden Rule is obligated to provide coverage for

his wife's medical expenses under an insurance policy it issued

effective June 23, 1992 (the "Policy").  Golden Rule also moves

for summary judgment, arguing that it properly rescinded the

Policy.

At issue are statements made by Mr. and Mrs. Hartwell on Golden Rule's Application for Insurance (the "Application"). Golden Rule argues that some of the answers to Application questions were both false and material, in that they were both incorrect and caused it to assume a greater risk than anticipated when it issued the Policy. Had it known the accurate details of Mrs. Hartwell's medical history, Golden Rule says, it would not have issued the policy. Mr. Hartwell counters by stating that the answers he and his wife gave were, as required by the terms of the Application, accurate and truthful <u>to</u> <u>the</u> <u>best</u> <u>of</u> <u>their</u> <u>knowledge</u> and belief at the time.

## Standard of Review.

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling upon a party's motion for summary judgment, the court must, "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). The moving party has the burden of demonstrating the absence of a genuine issue of material fact

2

for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  If the moving party carries its burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect brevis disposition." <u>Mesnick v. General Electric Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991), <u>cert. denied</u>, 504 U.S. 985 (1992).  <u>See also</u> Fed.R.Civ.P. 56(e).  This burden is discharged only if the cited disagreement relates to a genuine issue of material fact.  <u>Wynne v. Tufts University School of Medicine</u>, 976 F.2d 791, 794 (1st Cir. 1992), <u>cert. denied</u>, ___ U.S. ___, 123 L.Ed.2d 470, 113 S.Ct. 1845 (1993).  "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law."  <u>United States v. One Parcel of Real Property with Bldgs.</u>, 960 F.2d 200, 204 (1st Cir. 1992) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

As discussed more fully below, because there remain genuine issues of material fact, neither party is entitled to summary judgment.

**Factual Background.**

In December, 1978, Mrs. Hartwell became ill and was hospitalized. During that hospitalization, her liver enzyme levels were well above the normal range. A biopsy of her liver tissue revealed mild triaditis, but she tested negative for hepatitis B. Notes in her medical records indicate that her physicians assumed she had contracted hepatitis A. Nearly a year later, in October of 1979, Mrs. Hartwell returned to her physician for a complete physical. Her physician's notes reveal that:

> She was hospitalized for hepatitis several months ago. A liver biopsy demonstrated mild triaditis. She has been totally asymptomatic and has been back to work full-time this summer. She consumes no alcohol. The [liver enzymes], however, have been persistently modestly elevated both under 100. No symptoms referable to any chronic picture. . . . IMPRESSION: HEALTHY FEMALE WHO HAS RECOVERED FROM A TRIADITIS DESPITE THE PERSISTENT ELEVATION OF THE LIVER ENZYMES. Will simply watch this and I am not terribly concerned since the antigen was negative.

Keene Clinic Patient Records, October 10, 1979 (emphasis in original).

In the years following her hospitalization, Mrs. Hartwell saw her physician, Dr. Robert Englund, several times, but never for any symptoms related to either her earlier triaditis or her persistently elevated liver enzymes. Dr. Englund did, however, casually monitor her liver enzymes if she came in for some other purpose. Following one such office visit, for example, Dr. Englund wrote to inform her:

> The liver function studies are almost back to normal. Specifically, the SGOT is now within the normal range and the SGPT is only a few points elevated. All of the other blood tests are totally within normal limits. Thus everything seems to be fine and there is no need for any further tests in the near future.

Letter of Dr. Englund dated August 14, 1980. A little less than a year later, Dr. Englund again wrote to Mrs. Hartwell to report that, "Your liver function studies continue to improve. . . . Perhaps by next year they will be completely normal!" Letter of Dr. Englund dated May 25, 1981.

Although Dr. Englund's notes indicate that Mrs. Hartwell remained totally asymptomatic for hepatitis, in 1983 he also wrote that he believed she had "chronic persistent hepatitis probably related to non-A, non-B." Keene Clinic Patient Records,

5

April 1, 1983. During his deposition, however, Dr. Englund testified that he never communicated his belief to Mrs. Hartwell "because that is a diagnosis which would have meant nothing to her." Deposition of Dr. Englund at 59. Dr. Englund also stated that, at least as of 1983, he had informed Mrs. Hartwell that her liver enzyme tests revealed subtle abnormalities of liver function and told her that she "had some mild abnormality of the liver." Deposition of Dr. Englund at 63. Although she was unaware of Dr. Englund's impression that she probably suffered from chronic persistent non-A, non-B hepatitis, Mrs. Hartwell was aware of her history of elevated liver enzymes. Deposition of Dr. Englund at 63-64.

Mrs. Hartwell remained asymptomatic for hepatitis through 1993, with no indication of liver disease. See, e.g., Keene Clinic Patient notes dated November 14, 1988; February 24, 1989; and January 24, 1992. Dr. Englund's letters repeatedly assured her that, despite her persistently elevated liver enzymes, she really had little to be concerned about. On two occasions, however, Dr. Englund raised the matter of Mrs. Hartwell's possibly meeting with a specialist to discuss having another liver biopsy. Keene Clinic Patient Notes dated February 24, 1989

6

and January 24, 1992.  In light of her apparent good health and lack of any suggestion of liver disease (at least from her perspective), and financially constrained by a substantial deductible under her medical insurance policy, Mrs. Hartwell elected not to meet with the specialist.

Subsequently, the Hartwells decided to change insurance carriers.  On June 19, 1992, they completed Golden Rule's Application for Insurance and each represented that:

> I have personally completed this application and I represent that the answers and statements on this application are true, complete, and correctly recorded to the best of my knowledge.

Application at 2.  In reliance upon the information contained in the Application, Golden Rule issued a medical insurance policy to Mr. Hartwell, with Mrs. Hartwell as an insured spouse.  The policy became effective on June 23, 1992, for injuries, and July 7, 1992 for illnesses.

Approximately 20 months later, on February 27, 1994, doctors admitted Mrs. Hartwell to Cheshire Medical Center following a sudden onset of delirium and jaundice.  On March 11, 1994, she

7

was transferred to the New England Deaconess Hospital in Boston, where she died on March 27, 1994, of liver failure, kidney failure, and hemorrhaging. Prior to her death, Mrs. Hartwell incurred medical expenses of approximately $90,000.00.

After completing a review of her medical records, Robert Richey, an underwriter for Golden Rule, concluded that:

> Medical records received indicate that Patricia Hartwell <u>has</u> <u>been</u> <u>followed</u> at the Hitchcock Clinic for a <u>diagnosed</u> <u>condition</u> <u>of</u> <u>chronic</u> <u>persistent</u> <u>hepatitis</u>. Had <u>this</u> <u>information</u> been known at the time of underwriting, coverage for Patricia Hartwell would have been declined.

Underwriting opinion of Robert Richey, dated May 2, 1994 (emphasis added). By letter dated June 7, 1994, Golden Rule informed Mr. Hartwell that it would not provide coverage for his wife's medical expenses. It offered him the option of retaining his health insurance coverage or terminating the policy from its inception and receiving a full refund of premiums paid. This declaratory judgment action followed.

**Discussion.**

8

It is Golden Rule's position that the Hartwells made material misrepresentations in the Application when they failed to respond accurately to the following questions: (i) "Has any person [seeking coverage from Golden Rule], within the last 10 years, had any indication, diagnosis, or treatment of . . . any disorder of the . . . liver?"; and (ii) "What are the names of all doctors consulted in the past 5 years by persons named in this application.  List the doctors names and give full details."[1]

---

[1] Golden Rule also claims that, in response to a question asking whether the applicant had "discussed surgery with a doctor," the Hartwells should have disclosed Dr. Englund's suggestion that Mrs. Hartwell meet with a liver specialist to discuss the possibility of having a liver biopsy.  The court disagrees.  Plainly read, this question does not ask the applicant to disclose discussions regarding possible tissue biopsies.  Dorland's Illustrated Medical Dictionary (28th ed. 1994) defines "biopsy" as "the removal and examination, usually microscopic, of tissue from the living body, performed to establish precise diagnosis."  Id. at 200.  It defines "surgery" as "that branch of medicine which treats diseases, injuries, and deformities by manual or operative methods."  Id. at 1612.  Thus, a biopsy is done to facilitate (or confirm) a diagnosis.  Surgery is performed as a form of treatment.  While both procedures may be invasive, the terms are not synonymous.  Massachusetts Mut. Life Ins. Co. v. Allen, 416 P.2d 935, 941 (Okla. 1965).  Had Golden Rule wished to know if Mrs. Hartwell had discussed having a biopsy with her physician, it could have easily asked that question.  Having failed to do so, it cannot reasonably complain that she answered the question actually asked.

Golden Rule asserts that a complete and accurate response to the first question would have disclosed Mrs. Hartwell's history of elevated liver enzymes as well as Dr. Englund's ongoing monitoring. With regard to the second question, it claims that despite having seen Dr. Englund several times within the pertinent five-year period, Mrs. Hartwell disclosed only her most recent visit, stating that "all results [were] normal."

Golden Rule argues that under New Hampshire law Mrs. Hartwell's failure to disclose her history of elevated liver enzymes, and Dr. Englund's ongoing monitoring of those enzyme levels, justify rescission of her coverage. New Hampshire law provides:

> The falsity of any statement in the application for any policy covered by this chapter shall not bar the right to recovery thereunder, unless such false statement was made with actual intent to deceive, or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.

N.H. Rev. Stat. Ann. ("RSA") 415:9. Golden Rule does not claim that the Hartwells made the allegedly false statements with an "actual intent to deceive." It does, however, assert that the responses were false and materially affected the risk assumed and

10

its decision to provide coverage.  Affidavit of Robert Richey, ¶¶ 5-7, 9.

The legal questions presented under these circumstances are somewhat complicated.  First, under RSA 415:9, is the "falsity" of a statement made on an insurance application determined: (i) in an absolute sense (that is, without regard to what the applicant honestly believed her medical condition to be), or, (ii) from the perspective of the insured, taking into account what she knew and honestly believed when she completed the Application?  Stated differently, can an innocent but material misstatement on an insurance application support rescission of the Policy?  Secondly, have the parties, by contract, enlarged the applicable statutory protections in some meaningful way?

The first question has been addressed and resolved in different ways in other jurisdictions, based upon precise statutory language.  Compare Golden Rule Ins. Co. v. Hopkins, 788 F.Supp. 295, 301 (S.D.Miss. 1991) ("The insurer is entitled to rescind a policy, where falsity is shown, even if the insured believes that his application correctly reports his medical history because the law requires that an insured's statements be

true in fact."); with American Franklin Life Ins. Co. v. Galati, 776 F.Supp. 1054, 1060 (E.D.Pa. 1991) (Pennsylvania "law does not allow an insurer to rescind an insurance policy because of innocent mistakes by the insured, even if those mistakes involved misrepresentations of material facts."). See generally, A.M. Vann, Annotation, Insured's Statement, in Application for Life or Health Insurance or its Reinstatement, that He is in Good Health, as Absolute Representation of, or Mere Statement of His Good Faith Belief in, His Good Health, 26 A.L.R. 3d 1061 (collecting cases).

Some statutes treat an applicant's statement regarding physical condition as an opinion, made to the best of the applicant's knowledge and belief. See, e.g., Strickland v. Prudential Ins. Co., 278 S.C. 82, 292 S.E.2d 301 (1982) (insurance company liable to beneficiary where insured represented, in good faith, that he did not have cancer, even though his physician and family members were aware of his disease and terminal condition). Other states treat such statements as warranties, upon which the insurer is entitled to rely without regard to the applicant's good faith understandings. A review of the cases suggests that these divergent holdings are grounded in

12

specific statutory language or principles of contract law allowing rescission based on mutual mistake of fact.  See, e.g., Continental Assurance Co. v. Carroll, 485 So.2d 406, 409 (Fla. 1986) ("The plain meaning of the statute indicates that, where either an insurer would have altered the policy's terms had it known the true facts or the misstatement materially affects risk, a nonintentional misstatement in an application will prevent recovery under an insurance policy.")

By enacting RSA Ch. 415, the New Hampshire legislature appears to have merged these differing approaches in a statute that balances competing interests by allocating risks in reference to time.  As discussed below, under New Hampshire's statute, it is the date on which the loss occurs or the disability commences that is critical.

To understand New Hampshire's statutory limitations on rescission of insurance policies based on false statements, it is necessary to read RSA 415:9 (cited by Golden Rule) as part of the general regulatory structure governing accident and health insurance.  Part of that broader regulatory structure includes RSA 415:6, which provides, in part:

I.  REQUIRED PROVISION.  Except as provided in paragraph III of this section, each [accident and sickness] policy delivered or issued for delivery to any person in this state shall contain . . ..

(2)  A provision as follows:  Time Limit on Certain Defenses:

(a)  After 2 years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such 2-year period.

(The foregoing policy provision shall not be so construed as to affect any legal requirement for avoidance of a policy or denial of a claim during such initial 2-year period . . ..)

RSA 415:6 I(2)(a) (1994 Supp.).  Golden Rule's insurance policy dutifully contains a provision closely tracking the statutory language.  See Golden Rule Insurance Policy at 17, Section 16.[2]

The effect of the "Time Limit on Certain Defenses" clause, when construed in light of RSA 415:9, is plain.  If an insured

---

[2]  Section 16 of the Golden Rule policy provides:

Time Limit on Certain Defenses.  A misstatement by you in any application for this policy may be used to void this policy or to deny a claim.  This action may be taken in the first two years of a person's coverage.  After the two-year period, this action may be taken only for a fraudulent misstatement.

14

suffers an otherwise covered loss within two years of the issuance of the policy, the insurance company may rescind if the application for insurance contained a false statement, <u>without regard to the insured's actual knowledge or good faith beliefs</u>, provided the misstatement materially affected its acceptance of the risk or hazard insured. <u>Taylor v. Metropolitan Life Ins. Co.</u>, 106 N.H. 455, 458 (1965) ("it is not material to the application of this statute that fraud be shown either in fact or by implication. It is sufficient that the false statements materially affected either the acceptance of the risk or the hazard assumed by the insurer.") If, however, an insured suffers an otherwise covered loss beyond the initial two year period, then RSA 415:6 permits the insurance company to rescind the policy only if the misstatement on the application was made fraudulently or with actual intent to deceive. <u>Taylor v. Metropolitan Life Ins. Co.</u>, 106 N.H. at 462-63 ("We hold this clause to mean that after the policy has been in force for the time limit of two years a misstatement in the policy application cannot be used as a defense to a claim for a loss incurred . . . after that two-year period unless the insurer can affirmatively prove that the misstatement was made with intent to deceive.").

15

This statutory scheme allocates the risk of unknown or undiagnosed pre-existing conditions between the insured and the insurer.  During the first two years of coverage, the insured bears the risk that unknown ailments existed at the time of application; thereafter, the insurer bears that risk.[3]  Of course, the insured always remains accountable for intentional misrepresentations of material fact.

Since the expenses for which coverage is sought in this case were incurred within two years of the policy's effective date, Golden Rule would normally be entitled, under the statute, to rescind the policy and deny coverage if any material misstatement was made in the Application (even one made in complete good faith and without intent to deceive).  Ordinarily, there would be no need to determine whether the Hartwells completed the Application

---

[3]  Section 12 of the Golden Rule policy expressly addresses undisclosed "preexisting conditions."  It provides that during the first 12 months of the policy, no coverage exists for undisclosed preexisting conditions.  During the second 12 months of the policy, coverage is provided only for undisclosed preexisting conditions which, if disclosed in the Application, would not have materially affected either Golden Rule's decision to provide coverage or the risk assumed by Golden Rule, provided their existence was not fraudulently withheld by the insured.  Thereafter, coverage is provided for all undisclosed preexisting conditions unless their existence was fraudulently withheld from Golden Rule.  This "three-tiered" structure is not inconsistent with the two-tiered structure of RSA 415:9.

in good faith.  Even assuming that they did, neither their good faith belief in Mrs. Hartwell's sound health nor their ignorance of her actual medical condition at the time they completed the Application would be relevant.

Here, however, the Application itself substantially modifies the insured's statutory duty to provide accurate information, and affords even greater protection to an insured than does RSA Ch. 415.  The Application requires only that statements set forth be "true, complete, and correctly recorded <u>to</u> <u>the</u> <u>best</u> <u>of</u> [<u>the</u> <u>applicant's</u>] <u>knowledge</u>."  Application at 2 (emphasis added).  Accordingly, the proper inquiry under RSA 415:9 in this case is not whether the Hartwells' responses to questions on the Application were actually false and material, but whether their <u>certification</u>, that they had truthfully and accurately completed the Application to the best of their knowledge, was false.

An identical issue was presented in <u>Skinner v. Aetna Life</u> <u>and Casualty</u>, 804 F.2d 148 (D.C. Cir. 1986).  The governing statute employed language like that in RSA 415:9, permitting an insurance company to rescind based upon false statements contained in the application which were either fraudulent or

17

material to the risk assumed. However, in <u>Skinner</u>, as in this case, the insurance company qualified each of the responses on the policy application with the following certification: "The foregoing statements and answers are true and complete to the best of my knowledge and belief." In assessing the impact of the added certification on the company's ability to rescind the policy, the district court held:

> [The statute at issue] is typical of statutes that "are designed to relieve against the rigorous consequences of the common-law rules as to warranties and misrepresentations concerning insurance, particularly if made in good faith with no intent to deceive and in relation to a matter which does not increase the risk or contribute to the loss." While [the statute] and other similar statutes assure the insured of certain basic protections, they do not preclude the parties to an insurance contract from entering into an agreement "more favorable to the insured than the statute prescribes."
>
> In the case before us, Aetna chose to include language in its group insurance enrollment form that had the effect of shifting the focus, in a determination of the truth or falsity of an applicant's statement, from an inquiry into whether the facts asserted were true to whether, on the basis of what he knew, the applicant believed them to be true. Thus, [the insured's] answer must be assessed in the light of his actual knowledge and belief.

<u>Id</u>. at 150 (citations omitted).

18

By qualifying an applicant's representations as being "to the best of [her] knowledge," Golden Rule's Application also transformed the requested answers from warranties of fact to expressions of opinion within the knowledge and good faith belief of the responding applicant, thereby making an applicant's subjective knowledge or belief a material part of her answers. See, e.g., John Hancock Mut. Ins. Co. v. Rouse, 231 So.2d 786, 789 (Miss. 1970) ("The question is not whether or not [the insured] knew that he was afflicted with cancer. The question is whether he knew that his health was not good and whether in good faith, he should have disclosed these facts to the company at the time of the contract. The fact that he gave the opinion would not render the policy void, provided it was in good faith."); Service Life Ins. Co. v. McCullough, 234 Iowa 817, 826, 13 N.W.2d 440, 444 (1944) ("The appellant when it asked the insured whether he was `in good health and free from disease,' certainly knew that any answer he might give would be only his opinion, conclusion, or best judgment in the matter. It knew, of course, that he could not warrant or conclusively certify that he was in good health and free from disease. It knew that an affirmative answer would not be a warranty, but would be nothing more than a representation that, insofar as he reasonably and in good faith

19

knew, the answer was true.  It knew that it could put no greater reliance in such an answer.").  <u>See also</u> 1A Appleman, <u>Insurance Law and Practice</u>, §246 at 128 (1981) ("The question of good faith of the insured in making representations concerning health or the existence of disease is usually considered to be material in determining whether or not a misrepresentation will relieve the insurer of liability upon the policy. . . [An insurer] cannot require an applicant to answer questions concerning his past and present condition of his health with the skill of a trained physician . . ., especially when he has not been given such information by his doctor.").

Golden Rule's denial of coverage and invocation of rescission must be examined in light of the principles discussed above.  As mentioned, Golden Rule asserts that the policy Application contains at least two "materially false statements": Mrs. Hartwell's statement that she had no "indication, diagnosis, or treatment of [a] disorder of the liver" in the preceding ten years (Application, Question 15(e)); and, the Hartwells' implicit statement that in the five years immediately preceding completion of the Application they saw Dr. Englund once, for physicals.  <u>See</u> Application, Questions 20 and 21.

I.   Mrs. Hartwell's "Disorder of the Liver"

If in fact Mrs. Hartwell suffered from chronic persistent non-A, non-B hepatitis, she likely did not know it.  She was aware that Dr. Englund had, since her hospitalization in 1978, monitored and routinely checked her elevated liver enzymes.  However, she might have reasonably believed (based on the gradual lowering of her liver enzymes over time and Dr. Englund's emphatic reassurance) that her liver disorder was entirely a thing of the past and that she was fully recovered.  She also might have reasonably believed that she did not suffer from, and had had no indication during the preceding ten years of, any "disorder of the liver" when filling out the Application, and so, responded "No" truthfully, to the best of her knowledge.  In retrospect, with the benefit of complete access to Mrs. Hartwell's medical records and Dr. Englund's candid explanation of her medical history and his diagnosis, it would seem apparent, now, that Mrs. Hartwell probably did suffer from a "disorder" of the liver as indicated by the elevated enzyme levels: likely chronic, persistent non-A, non-B hepatitis.  But it is far from clear on this record that her knowledge and understanding were of a kind or degree sufficient to render her "No" response to

Question 15(e) knowingly false, in violation of her certification, as a matter of law.

    II.  Disclosure Concerning Doctors Consulted
         in Past Five Years.

    Golden Rules also argues that the Hartwells answered Application Questions 20 and 21 inaccurately and incompletely. Those questions asked:

    20.  What are the names of all doctors consulted in the past 5 years by persons named on this application.  List the doctors' names and give full details in #21 below.

    21.  IMPORTANT: Give complete details of any "Yes" answers to Questions 11 thru 19 and respond to Question 20.

The Hartwells answered by providing the following information under Question #21:

| Symptoms or Condition | Dates | Treatment, Advice Given, Results, & other Details | Name and Address of Doctor |
|---|---|---|---|
| Physicals | 1/92 | All results normal | Robert Englund Keene Clinic, 590 Court St. Keene, NH 03431 |

Application at 2.  Read literally, Question 20 asks the applicant to provide the names of all doctors consulted within the past five years.  The Hartwells complied by giving Dr. Englund's name

22

and complete address. Nothing before the court suggests that the Hartwells consulted any other physician in the previous five years. The question then asks the applicant to "give full details in #21 below." This portion of the question, because of its imprecise language, creates an ambiguity.

Golden Rule argues that, "[q]uestions 20 and 21 clearly and without ambiguity asked for complete details of doctors' visits within the last 10 [actually 5] years." Plaintiff's Memorandum at 17 (emphasis in original). Question 20 nowhere expressly asks the applicant to provide the details of all doctor visits, or even to list each visit or each consultation within the previous five years. It simply asks for the names of doctors consulted and instructs the applicant to "give full details in #21 below."

Question 21 relates to more than just Question 20. It also accepts explanatory information related to "Yes" answers to Questions 11 thru 19 (disease history). For example, Question 15(e), as noted, asks whether the applicant has "within the last ten years had any indication, diagnosis, or treatment of any disorder of the . . . liver?"

To the extent they relate to Question 20, the categorical headings of Question 21 (i.e. "Symptoms or Condition," "Dates," "Treatment," "Advice Given," "Results & Other Details," and "Name and Address of Doctor") apply to "doctors consulted in the past 5 years." One might reasonably construe Questions 20 and 21 together as asking for the complete name and address of each doctor consulted within the past 5 years, the dates encompassing the relationship, the general reasons for consultation on those occasions, nature of treatment received, and the outcome. The question also implicitly suggests that named doctors will be contacted by the company.

Considering Questions 20 and 21 in that light, and given the facts presently before the court, the Hartwells could be found to have provided accurate and sufficient responses. The court cannot conclude, as a matter of law, that the Hartwells' responses to Questions 20 and 21 were "false" within the meaning of RSA 415:9 as modified by the Policy's certification language, because they did provide details regarding Dr. Englund's name and address, disclosed that they both recently underwent complete physicals, and reported the "details" of their course of treatment with Dr. Englund by disclosing that all test results

24

were normal, thereby conveying the facts underlying their belief in their sound health.  In short, their responses, considered as a whole, communicated that physical exams were sought and obtained, tests were performed, results were normal, and no substantial problems existed.[4]

Although the Hartwells failed to list either of Mrs. Hartwell's two other visits to Dr. Englund during the relevant five-year period (on February 12, 1988 and November 4, 1988), and in that sense answered falsely, neither of those visits related to, or gave any indication of, liver disorder.  One visit was for a complete history and physical examination.  The other was apparently prompted by some nocturnal chest discomfort which Mrs. Hartwell was experiencing.  Her physician noted, however, that her symptoms were non-cardiac and probably gastroesophageal.  So, even if "false," the issue of materiality arises.

---

[4]  Despite Mrs. Hartwell's history of elevated liver enzymes, Dr. Englund's notes concerning the January, 1992 physical reveal that, "a decision has been made not to proceed with liver studies now . . .."  Accordingly, it appears that all tests actually performed came back normal and the Hartwells did not misstate the results of any tests in responding to question 20.

Accordingly, the Hartwells' answer to Questions 20 and 21 cannot be said, as a matter of law, to have been false <u>and</u> material, or, more to the point, <u>knowingly</u> false in violation of their certification. The only "details" omitted were notice of routine physicals and a visit relating to gas pain, which Golden Rule does not argue were material. Importantly, the physician's notes pertaining to these visits repeatedly state that Mrs. Hartwell was "asymptomatic for hepatitis," had "no stigmata of liver disease," and that there was "nothing to suggest chronic liver disease." <u>See</u> Keene Clinic Patient notes dated February 12, 1988, November 4, 1988, and January 24, 1992. Equally significant is the fact that Dr. Englund did not, at any time, inform Mrs. Hartwell that he suspected she might have chronic, persistent hepatitis.

Golden Rule could perhaps stretch a point, by arguing that Dr. Englund's mention of a possible consultation with a liver specialist and biopsy, within the five-year period pertinent to Question 20, constituted material "Advice Given" which should have been disclosed under that category in Question 21. But, whether Dr. Englund "advised" Mrs. Hartwell to have a biopsy or to see a liver specialist within the meaning of the Application's

26

language, and whether Mrs. Hartwell understood his words to constitute "advice" in that sense, would appear to qualify as genuine issues of material fact about which the parties disagree. Once again, the critical issue is Mrs. Hartwell's good faith certification on the Application that she answered all questions to the best of her knowledge.  Parenthetically, Dr. Englund testified at his deposition that, as of 1992, he was not concerned with having Mrs. Hartwell obtain any further liver tests.[5]

Because the Hartwells' disclosures in response to Questions 20 and 21, and 15(e) are not inconsistent with at least one reasonable reading of the Application given the facts of record,

---

[5]  At his deposition, Dr. Englund had the following exchange with counsel for Golden Rule regarding Mrs. Hartwell's health and his comments regarding a possible liver biopsy:

> A.  [As of January, 1992,] there's been absolutely nothing to suggest chronic liver disease.  She is not wanting to pursue other tests now because of a very high deductible insurance coverage and limited work for the patient and husband.  So I therefore did not -- did not push anything else then.

> Q.  Did you want her to have tests, further testing done of the liver on January 24, 1992?

> A.  Not really.

Deposition of Dr. Robert Englund at 76.

the court cannot find as a matter of law that Golden Rule was entitled to rescind the Policy based on those responses.

### Conclusion.

While the applicable statutory framework (RSA Ch. 415) would have ordinarily made the Hartwells' good faith immaterial, the language of the Application does make it material. And, because the Hartwells' good faith understanding of Mrs. Hartwell's condition are material facts about which the parties seem to disagree, neither is entitled to summary judgment. Accordingly, Mr. Hartwell's Motion for Summary Judgement (document no. 7) and Golden Rule's Cross-Motion for Summary Judgment (document no. 12) are denied.


SO ORDERED.


_____
Steven J. McAuliffe
United States District Judge

July 17, 1995

cc:  John D. Wrigley, Esq.
     David A. Anderson, Esq.
     Jeffrey S. Cohen, Esq.

28